Brian S. King, #4610
Brent J. Newton, #6950
Nediha Hadzikadunic, #15851
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JOHN DOE and JANE DOE,<br><br>            Plaintiffs,<br><br>vs.<br><br>UNITED HEALTHCARE INSURANCE COMPANY, and the DELOITTE LLP GROUP INSURANCE PLAN.<br><br>            Defendants. | COMPLAINT<br><br>2:20-cv-00677 DBP |

Plaintiffs John Doe ("John") and Jane Doe ("Jane"), each of whom are designated by pseudonyms, through their undersigned counsel, complain and allege against Defendants United Healthcare Insurance Company ("United") and the Deloitte LLP Group Insurance Plan ("the Plan") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. John and Jane are natural persons residing in Dallas, Texas. John is Jane's father.

2. United is an insurance company headquartered in Hennepin County, Minnesota and was the third-party claims administrator for the Plan during the treatment at issue in this case.

1

3. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). John was a participant in the Plan and Jane was a beneficiary of the Plan at all relevant times. John and Jane continue to be participants and beneficiaries of the Plan.

4. Jane received medical care and treatment at Pacific Quest from September 27, 2017, to November 20, 2017, and the Menninger Clinic ("MC") from November 22, 2017, to January 21, 2018. These are treatment facilities which provide inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems. Pacific Quest is located in Hawaii and MC is located in Texas.

5. United, acting in its own capacity or through its subsidiary and affiliate United Behavioral Health ("UBH"), or under the brand name Optum, denied claims for payment of Jane's medical expenses in connection with her treatment at Pacific Quest and MC. This lawsuit is brought to obtain the Court's order requiring the Plan to reimburse John for the medical expenses he has incurred and paid for Jane's treatment and to obtain appropriate equitable relief for the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA")

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions and because United has a claims processing and appeals office in the state of Utah.

8. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for

appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of MHPAEA, an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### Jane's Developmental History and Medical Background

9. Around September of 2016, Jane started exhibiting symptoms consistent with an eating disorder. She greatly restricted her food intake and started dramatically losing weight. Jane started seeing a psychologist and a doctor who specialized in treating eating disorders. Jane also began having frequent panic attacks and demonstrated frequent obsessive-compulsive behaviors.

10. In April of 2017, Jane was admitted to a partial hospitalization program for the treatment of eating disorders. Jane was able to complete the program but shortly afterwards she was found to be self-harming after she weighed herself while at a friend's house.

11. Jane's school counselor expressed alarm at her self-harming behaviors and informed John that Jane would not be able to return until she resolved this issue and received medical clearance from her doctors. Upon hearing this news, Jane expressed a desire to commit suicide and continued to self-harm.

### Pacific Quest

12. Jane was admitted to Pacific Quest on September 27, 2017. While in treatment Jane continued to have severe mood dysregulation issues and on the night of November 13, 2017, she attempted suicide by drowning. Following this incident Jane was placed on emergency watch status until she could be transferred out of the program.

13. In an Explanation of Benefits statement dated May 4, 2018, United denied payment for Jane's treatment under code AY- "THE PROCEDURE CODE SUBMITTED IS NOT ELIGIBLE FOR PAYMENT. THEREFORE, NO BENEFITS ARE PAYABLE FOR THIS SERVICE."

14. On October 22, 2018, Jane's mother submitted an appeal of the denial. She argued that, contrary to United's assertion, Jane's treatment was a covered benefit under the terms of the Plan. She reminded United of its responsibilities under ERISA including its obligation to take into account all of the information she provided, to assign appropriately qualified reviewers with experience treating individuals with Jane's diagnoses, and to provide her with a full, fair, and thorough review.

15. Jane's mother wrote that she had previously submitted a complaint to the Plan administrator protesting the denial of payment and stating that Jane's treatment was a covered service. Jane's mother also stated that she had spoken to a representative from United and was told that the revenue code for Jane's treatment was valid even though it had been denied as if it were not. Jane's mother wrote that she never received a response to this complaint.

16. She argued that Pacific Quest was an intermediate level behavioral health facility and that it was covered under the terms of the Plan. She stated that she was unable to find any exclusion for outdoor behavioral health services nor did Pacific Quest fall under the Plan's definition of experimental, investigational, or unproven services. She contended that Pacific Quest met the Plan's criteria to be classified as an alternate facility.

17. She included peer-reviewed studies extolling the benefits of outdoor behavioral health programs, especially for individuals who had been resistant to other types of treatment.

These studies found that a significant portion of individuals who received outdoor behavioral health treatment no longer required additional treatment after a year, while the vast majority of the control group who did not receive outdoor behavioral health treatment but instead received treatment at the outpatient level did require further treatment after a year of outpatient treatment.

18. She requested that in the event that United upheld the denial that it provide her with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits she was seeking, any administrative service agreements that existed, the Plan's mental health and substance abuse criteria, the Plan's criteria for skilled nursing and rehabilitation facilities, and any reports from any physicians or other professionals regarding the claim. (collectively the "Plan Documents")

19. In a letter dated November 21, 2018, United again denied payment for Jane's treatment at Pacific Quest. The reviewer gave the following justification for the denial:

    > As requested an appeal/grievance review was completed on a request we received on 10/23/2018. …
    >
    > Based on my review of this request, including the supporting documentation which was submitted with your appeal letter, the submitted claims for date(s) of service, 09/27/2017 through 11/20/2017, have not been approved for payment. A review of the claim in question reveals that Wilderness Therapy (Revenue code 1006) is not a covered service under your Mental Health policy. Therefore, the denial of this service stands as these services are not eligible for payment. …

20. On January 7, 2019, John submitted a level two appeal of the denial. John expressed concern that as United had changed its denial rationale. He alleged that United's initial denial justification was just a "trial run" allowing it to shift its denial rationale after the initial appeal. John expressed concern that, as this was his final internal appeal, United

was acting in bad faith and that the transient nature of its denial rationales was a way to run out the clock and deprive him of the opportunity to effectively respond to the denial.

21. John contended that United had not complied with its obligation to utilize an appropriately qualified reviewer. He suggested that United was acting in an arbitrary and inconsistent manner and that it was not complying with its ERISA obligations. He expressed concern that he had not been provided with the full, fair, and thorough review to which he was entitled. He reiterated that Jane's treatment was a covered benefit under the terms of the Plan, and that wilderness programs were not excluded under the terms of the plan contract.

22. He asserted that United's denial was in violation of MHPAEA. He stated that MHPAEA compelled insurers to offer coverage for their mental health benefits "at parity" with comparable medical or surgical benefits. He identified intermediate level medical facilities such as skilled nursing care as some of the medical or surgical analogues to Jane's treatment at Pacific Quest. He again requested to be provided with a copy of the Plan Documents.

23. In a letter dated April 8, 2019, United upheld the denial of payment for Jane's treatment. The letter stated in part:

> As requested, I have completed an appeal/grievance review on a request we received 3/11/2019.[1] This review included an examination of the following information: appeal letter, case notes, and claim processing system. After fully investigating the substance of the appeal/grievance, including all aspects of clinical care involved in this treatment episode I have determined that benefit coverage is not available for the following reason(s):
>
> Based on my review of the request, including any supporting documentation which may have been submitted with your appeal letter, I have determined that the submitted claim for dates of service 09/27/2017 through 11/22/2017 have not

---

[1] It is unclear why there is such a large discrepancy between the time John drafted his appeal and the date United claimed to have received it.

been approved for additional payment. This claim was appropriately processed, due to Current Procedural Terminology Code (CPT) is eligible for payment [sic]. No further payment will be issued.

24. In a letter dated May 8, 2019, United stated that John and Jane had 180 days from the November 21, 2018, denial to appeal the adverse decision, but because their appeal had allegedly not been received during that time period, it would not be processed. Again, this letter is puzzling as United had presumably already responded to an appeal request in its April 8, 2019, letter. As John's level two appeal was drafted on January 7, 2019, it is unclear which of these two letters (if any) was intended to respond to that appeal, or if they each reference some other undisclosed appeal such as from the facility.

25. Compounding the uncertainty, United also sent John a "Revised Letter" dated June 25, 2019, however it is again unclear which letter it is supposed to be revising, as the letter purports to respond to "a request we received 01/09/2019", implying that this letter, dated nearly six months later, and not the other two letters, was the actual response to John's level two appeal. The letter also offers a distinct denial rationale from United's other letters. It stated in part:

> …As requested, I have completed an appeal/grievance review on a request we received 01/09/2019. …
>
> The non-coverage determination for Mental Health Outdoor/Wilderness Behavioral Therapy level of care will be upheld on 09/27/2017 through 11/20/2017. This is based on Optum Level of Care Guidelines for Outpatient Treatment of Mental Health Disorders and the Optum Common Criteria and Clinical Best Practices for All Levels of Care Level of Care Guidelines. The submitted information was reviewed. It does not include any medical records for your treatment at Pacific Quest. There is no clinical information to assess your symptoms or the services provided. Additionally, your care took place in a wilderness therapy program, which is considered an unproven service, and is therefore not a covered benefit of your plan. …

26. United then sent a second revised letter dated June 26, 2019. This letter was functionally the same as the June 25, 2019, revised letter except the appeal information had been changed and had presumably been corrected.

**MC**

27. Jane was admitted to MC on November 22, 2017, shortly after her suicide attempt at Pacific Quest. United denied payment for this treatment as well.

28. On June 21, 2018, John appealed the denial of payment for Jane's treatment. John stated that MC was the medically necessary level of care to deal with Jane's Anorexia Nervosa, self-harming behaviors, and suicidal ideation and was necessary to teach her how to self-regulate and keep herself safe. He stated that prior to her admission to MC, Jane was saying things like "I should just kill myself now so that people will remember me at this weight versus a higher weight."

29. John noted that due to Jane's frequent self-harm she required constant monitoring and that on some occasions her desire to self-harm was so overwhelming that she spent the day sitting in the nurse's station to combat it. He pointed out that Jane was placed on suicide precautions before she left Pacific Quest and that she was kept on precautions when she arrived at MC.

30. John included a psychological assessment dated November 3, 2017, from one of Jane's psychologists, Quintin Harvey Ph.D. which talked about Jane's suicidal ideation, severe depression, and hopelessness. Dr Harvey recommended that "Based on the results of the current evaluation and her history of poor response to less comprehensive treatment efforts, [Jane] is in need of continued residential therapeutic intervention."

31. In a letter dated September 12, 2018, United denied payment for Jane's treatment at MC. The letter, attributed to Kenneth Fischer, MD. stated in part:

    > As requested, I have completed an appeal/grievance review on a request we received 08/13/2018.[2] This review included an examination of the following information: Optum Case Notes, Appeals Materials: Letter of Appeal and Medical Record, Optum Level of Care Guideline for the Mental Health Inpatient Level of Care and Common Criteria and Clinical Best Practices for all levels of care. After fully investigating the substance of the appeal/grievance, including all aspects of clinical care involved in this treatment episode I have determined that benefit coverage is not available for the following reason(s):

    > Based on the Optum Level of Care Guideline for the Mental Health Inpatient Level of Care and Common Criteria and Clinical Best Practices for all levels of care, it is my determination that no authorization can be provided from 11/22/17 forward. Your condition had improved and stabilized. You were medically stable. You had no active suicidal or self harm thinking, with intent or plan. You posed no risk of harm to others - you were not homicidal, threatening, or aggressive. You had no bizarre beliefs and were not hallucinating. No severe mood disturbance was present. You were taking and tolerating your medications. You were able to care for yourself. You were attending groups and therapies. Your behaviors and symptoms were not so severe or impaired that they would have prevented care in a less restrictive setting. You could have continued care in the Mental Health Partial hospitalization setting available.

32. On November 6, 2018, John appealed the denial of payment for Jane's treatment at MC. John contended that it was clear that United did not adequately review Jane's medical records as these showed that Jane was experiencing suicidal ideations and urges to self-harm. He contended that it was only because of the high level of supervision that she was receiving at MC that she was able to stay safe.

33. He reminded United of its responsibilities under ERISA and asked it to fully review the information that he provided. He expressed concern that although he had previously argued that Jane's self-harming behaviors, suicidal gestures and ideations, ongoing eating disorder related urges, and severe emotional dysregulation had not been successfully

---

[2] Again, it is unclear why such a large discrepancy exists between the time John drafted his appeal and when United claimed to have received it. This once more makes it unclear whether United is responding to John's appeal in this denial or if it instead references another document like a facility appeal.

treated at other levels of care, he argued that United had not properly taken this into account.

34. He pointed out that Jane had attempted suicide after receiving treatment at Pacific Quest for nearly two months, and in spite of her treatment at lower levels of care. He contended that Jane needed the treatment she was receiving at MC in order to keep herself safe as well as to treat her co-occurring conditions. John included a copy of Jane's medical records to support this, these records showed Jane's ongoing acts of self-harm as well as statements such as "Everyone would be better off if I was dead." and that "everything would be solved if she could only be thinner and smaller."

35. He argued that Jane was in genuine danger of deliberately or perhaps accidentally taking her life without the treatment she received. He noted that generally accepted standards of care stated that residential treatment was an appropriate level of care for individuals with her diagnoses and self-harming behaviors.

36. John took issue with United's denial of Jane's treatment due to a supposed lack of "active" suicidal ideation. He noted that it was very common for individuals like Jane experiencing frequent passive suicidal ideation to become actively suicidal during a moment of dysregulation. He quoted a letter from Robert Simon, MD. to this effect. Dr. Simon also argued that individuals experiencing active suicidal ideation "may feel less conflicted reporting suicide ideation in the passive mode" to avoid being judged, and that passive suicidal ideation did not signify a low risk of suicide. John noted that Jane's suicide attempt while in treatment was made while she was reporting only "passive" suicidal ideation.

37. John listed United's criteria for inpatient treatment and argued that Jane met these criteria. He asserted that Jane's eating disorder and her self-harm put her at serious risk. He contended that Jane's treatment was medically necessary, that she met the criteria for the level of care she was receiving, and that MC was the most appropriate program to treat Jane's conditions. John requested to be provided with a copy of the Plan Documents.

38. In a letter dated December 21, 2018, United upheld the denial of payment for Jane's treatment. The letter gave the following justification for the denial:

    > Based on the Optum Level of Care Guideline for the Mental Health Inpatient Level of Care, it is my determination that that [sic] no authorization can be provided from 11/22/2017 forward.
    > You were admitted for treatment of problems with your mood and problems with your eating. After reviewing the medical records, it is noted that your condition did not meet Guidelines for coverage of treatment in this setting. You were not planning to hurt yourself or others. You were stable from a medical standpoint. You were motivated and participating in treatment. You were using the skills you had learned. You had family support. You did not require 24-hour psychiatric nursing care and daily physician visits. You could have continued care in the Mental Health Partial Hospitalization Program setting.

39. On April 5, 2019, John requested that the denial of payment for Jane's treatment at MC be evaluated by an external review agency. He requested that the case be assigned to an appropriately qualified reviewer with specializations in Jane's diagnoses. John expressed concern that United made no reference to Jane's medical records or any of the other documents he provided. He asked the external reviewer to reference the materials that they relied upon.

40. He argued that despite the constant monitoring she was under, Jane was still successful at self-harming while in treatment. He questioned how United could claim that Jane was not a danger to herself when her medical records clearly indicated the opposite. He noted that

11

lower levels of care had been unsuccessful and again argued that Jane met United's criteria.

41. John referenced *Wit, et.al., v. United Behavioral Health*, a class action case where United's clinical guidelines[3] were found to be inconsistent with generally accepted standards of medical practice. He stated that in *Wit* the court had found that United improperly pressured its insureds into a lower level of care, even when treating physicians opined that a higher level of care would be more effective. John expressed concern that United's guidelines were more interested in maintaining profit margins than in acting in the insured's best interest.

42. John requested that the reviewer defer to sources that were more appropriate to determine the medical necessity of Jane's mental health treatment such as the Clinical Practice Guidelines from the American Psychological Association, he noted that these guidelines recommended inpatient care for individuals like Jane who were expressing suicidal thoughts. John requested to be provided with a copy of the Plan Documents in the event that the denial was upheld.

43. In a letter dated July 17, 2019, the external review agency upheld the denial of treatment for Jane's treatment. The letter stated in part:

> The patient is a 19 year old female (DOB [redacted]) with a history of unspecified depressive disorder, unspecified alcohol related disorder, unspecified feeding or eating disorder and unspecified obsessive compulsive related disorder, who is requesting Mental Health Inpatient level of care at Menninger Clinic from 11/22/17 through 1/21/18. The patient had expressive [sic] vague, passive suicidal ideation with no plan. The patient was transferred to this facility from a Residential Facility where she was reportedly residing for two months. The patient had no active medical problems. The patient's weight is within normal limits. The patient is not manic or psychotic.

---

[3] John acknowledged that the guidelines discussed in *Wit* were not necessarily the exact same guidelines used to evaluate Jane's treatment, but he expressed concern that United was "continuing the same practices that the judge ruled against in Wit. …"

> In this case, the patient does not demonstrate symptoms of psychosis or mania. There is no acute behavioral disturbance requiring 24-hour psychiatric nursing care or hospitalization. No further medication management is noted that would have required Inpatient level of care and the patient was taking and tolerating medications. There was [sic] no significant self-care deficits due to mental illness requiring this level of care. There is no ongoing psychosis or mania, which can require Inpatient level of care. The patient was not withdrawing [sic] from any substance which can require medical monitoring in an Inpatient Psychiatric Unit. The patient was not on any psychotropic medications requiring frequent blood work or close monitoring. There are no co-morbid medical conditions. The patient can be safely and effectively treated in a less restrictive setting such as Partial Hospitalization Program or Intensive Outpatient Program.
>
> As such, the patient does not meet the medical necessity criteria for admission to the Inpatient Acute Psychiatric Hospitalization at Menninger Clinic from 11/22/17 to 1/21/18.
>
> Therefore, based on the submitted clinical documentation and standard of care, the requested Mental Health Treatment Inpatient Level of care on 11/22/2017 through 1/21/2018 is not supported as medically necessary for this patient in this case.

44. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

45. The denial of benefits for Jane's treatment was a breach of contract and caused John to incur medical expenses for which the Plan should have paid totaling over $125,000.

46. United failed to produce a copy of the Plan Documents including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities in spite of John's requests.

**FIRST CAUSE OF ACTION**

**(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))**

47. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as United, acting as agent of the Plan, to "discharge [its] duties in respect to claims

processing solely in the interests of the participants and beneficiaries" of the Plan. 29 U.S.C. §1104(a)(1).

48. United failed to provide coverage for Jane's treatment in violation of the terms of the Plan which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

49. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

50. The denial letters produced by United do little to elucidate whether United conducted a meaningful analysis of the Plaintiffs' appeals or whether it provided them with the "full and fair review" to which they are entitled. United failed to substantively respond to the issues presented in John's appeals and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

51. In addition, United relied on boilerplate recitations such as "including any supporting documentation which may have been submitted with your appeal letter." Phrases such as "may have been submitted" are consistent with a cursory rather than a thorough or full review.

52. United engaged in other practices suggesting a less than thorough review of Jane's treatment. For instance, although John repeatedly referenced Jane's suicide attempt while in treatment and her suicidal ideation, United's denial letters repeatedly make assertions such as "You were not planning to hurt yourself or others" while not so much as acknowledging the information John presented.

53. United and the agents of the Plan breached their fiduciary duties to Jane when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in Jane's interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of Jane's claims.

54. The actions of United and the Plan in failing to provide coverage for Jane's medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

55. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA.

56. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

57. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

58. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity, restrictions based on geographic location, facility type, provider

specialty, and other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A) and (H).

59. The medical necessity criteria used by United for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

60. In addition, the level of care applied by United failed to take into consideration the patient's safety if she returned to a home environment, as well as the risk of decline or relapse if less intensive care than what was medically necessary was provided. Generally accepted standards of medical practice for medical and surgical rehabilitation under the Plan take into consideration safety issues and considerations of preventing decline or relapse when admission into an intermediate care facility, such as a skilled nursing or rehabilitation facility, is approved.

61. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for Jane's treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities. For none of these types of treatment does United exclude or restrict coverage of medical/surgical conditions by imposing acute care requirements for a sub-acute level of care. To do so, would violate not only the terms of the insurance contract, but also generally accepted standards of medical practice.

62. In its review of Jane's claims, United's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that Jane received. United's improper use of acute inpatient medical necessity criteria is revealed in the statements in

United's denial letters such as "You had no active suicidal or self harm thinking, with intent or plan." This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that Jane received. The Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits.

63. The treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

64. The Defendant cannot and will not deny that use of acute care criteria, either on its face or in application, to evaluate sub-acute treatment violates generally accepted standards of medical practice. They must and do acknowledge that they adhere to generally accepted standards of medical practice when they evaluate the medical necessity criteria of both mental health/substance use disorders and medical/surgical claims.

65.  As another example of the Defendants' improper application of its criteria to evaluate the treatment Jane received, the Defendants relied on assertions such as "You had no bizarre beliefs and were not hallucinating" as a justification to deny treatment. In fact, these serve as an indicator rather than a contra-indicator of the medical necessity of treatment in a non-acute residential setting.

66. When United and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice. United and the Plan

evaluated Jane's mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

67. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and United, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

68. The violations of MHPAEA by United and the Plan give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

   (a) A declaration that the actions of the Defendants violate MHPAEA;

   (b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

   (c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

   (d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

    (e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

    (f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

    (g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

    (h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

69. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for Jane's medically necessary treatment at Pacific Quest and MC under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4. For such further relief as the Court deems just and proper.

DATED this 25th day of September, 2020.

By    s/ Brian S. King
       Brian S. King
       Attorney for Plaintiffs

Place of Plaintiffs' Residence:
Dallas, Texas